IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ETHAN WEBB, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | Civil Action No. 11-718 |
| v. | ) |  |
|  | ) | Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**MEMORANDUM OPINION**

I. **INTRODUCTION**

Ethan Webb ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 7, 9). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration on April 24, 2007, claiming an inability to work due to disability as of January 4, 2005. (R. at 84)[1]. Plaintiff was initially denied benefits on August 28, 2007. (R. at 41 – 49). A hearing was scheduled for April 17, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 19 – 38). A vocational expert, Fred A. Monaco, also testified. (R. at 19 – 38). The Administrative Law Judge ("ALJ"), James Bukes, issued his decision denying benefits to Plaintiff on July 21, 2009. (R. at 7 – 18). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on March 29, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint in this court on June 1, 2011. (ECF No. 3). Defendant filed his Answer on August 16, 2011. (ECF No. 4). Cross motions for summary judgment followed. (ECF Nos. 7, 9).

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born January 5, 1964 and was forty five years of age[2] at the time of his administrative hearing. (R. at 23). Plaintiff completed high school, but had no post-secondary education or vocational training. (R. at 23). Past employment included stints as a landscaper and a security guard. (R. at 23 – 24). Plaintiff also provided care for his mother until her passing in May of 2008. (R. at 30).

---

[1] Citations to ECF Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

[2] Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

When he applied for benefits in 2007, Plaintiff lived in an apartment. (R. at 122 – 31). Despite difficulties with standing, sitting, and walking attributable to leg and shoulder pain, Plaintiff prepared simple meals, cleaned, traveled independently, bought groceries, spent time with friends, and attended sporting events. (R. at 122 – 31). He claimed that his physical limitations prevented him from engaging in full-time employment, however. (R. at 122 – 31). Plaintiff had not worked since 2005. (R. at 24).

B. Medical History

Plaintiff was treated by Pittsburgh Bone & Joint Surgeons of McKeesport, Pennsylvania beginning with an injury to his left foot in 2001 while working. (R. at 222, 232 – 34). Several bones were broken, but by September of 2001, his foot was healing well. (R. at 222). This improvement continued through January 2002. (R. at 214 – 16, 218, 233 – 34). Plaintiff was cleared for his return to work as of January 7, 2002. (R. at 212 – 13).

Plaintiff reported to the emergency room complaining of left hip pain in January of 2006. (R. at 197). Diagnostic imagining at UPMC McKeesport Hospital ("UPMC") showed that Plaintiff's hip and hip joint areas were normal. (R. at 197). In March of 2006, Plaintiff also went to Pittsburgh Bone & Joint Surgeons complaining of the same left hip and leg pain. (R. at 194). The examining physician noted that while there was some mild atrophy of the left thigh, Plaintiff's range of motion was good, his reflexes were intact, and diagnostic imaging was unremarkable. (R. at 194). Plaintiff was diagnosed with lumbar radiculopathy[3]. (R. at 194). He was given Vicodin for his pain. (R. at 194). Plaintiff's primary care physician Harry E. Lanauze, M.D. completed an Employability Assessment Form, indicating that Plaintiff was

---

[3] Lumbar radiculopathy, also referred to as a herniated disk, occurs when part or all of a disk in the spine is forced through a weakened portion of the disk and exerts pressure on adjacent nerves. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478/ (last visited October 31, 2011).

3

temporarily disabled from January 4, 2006 through September 4, 2006 due to leg pain. (R. at 195 – 96).

Plaintiff appeared in the UPMC emergency department in August of 2007 complaining of right knee pain and difficulty walking. (R. at 295). Plaintiff complained that he had been experiencing knee pain for nearly six months, and that the pain had intensified over the previous week. (R. at 295). Plaintiff was found to be in no acute distress, and had slight tenderness in his right knee, but had no swelling, crepitus[4], limitation of movement, redness, or calf tenderness. (R. at 296). Diagnostic imaging showed slight narrowing of the lateral knee compartment, and degenerative joint disease[5]. (R. at 294). Plaintiff was given a prescription for Vicodin and was advised to see his doctor. (R. at 296).

Plaintiff was seen at Pittsburgh Bone & Joint Surgeons shortly thereafter. (R. at 210). The examining physician noted that Plaintiff had on-and-off knee pain for some time. (R. at 210). Plaintiff asserted that his lumbar radiculopathy had caused him to walk awkwardly, creating his knee condition. (R. at 210). The physician observed mild effusion[6], tenderness, and mild grating; however, testing was negative for abnormality, and there was no evidence of instability. (R. at 210). Diagnostic imaging showed some lateral compartment narrowing of the right knee. (R. at 210). Plaintiff was diagnosed with degenerative joint disease and was given an injection of lidocaine for pain. (R. at 210). In September, Dr. Lanauze completed another

---

[4] Crepitus, also referred to as subcutaneous emphysema, occurs when air gets into tissues under the skin and can indicate the presence of an infection. Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003286.htm (last visited October 31, 2011).

[5] Degenerative joint disease, also referred to as osteoarthritis, is a common joint disorder caused by wear and tear on a joint. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001460/ (last visited October 31, 2011).

[6] Effusion, or "water on the knee," is a term for the collection of excess fluid in or around the knee joint, which can indicate trauma, overuse, or any underlying disease or condition. MayoClinic, http://www.mayoclinic.com/ health/water-on-the-knee/DS00662 (last visited October 31, 2011).

Employability Assessment Form indicating that Plaintiff was temporarily disabled beginning August 1, 2007 and ending June 1, 2008, due to leg pain. (R. at 323 – 24).

Plaintiff underwent further diagnostic imaging of his right knee in October and November, which showed osteophyte formation, mild extrusion, effusion, and some thinning of the cartilage. (R. at 207, 290). His physician at Pittsburgh Bone & Joint Surgeons noted a lack of improvement in Plaintiff's knee since his last visit. (R. at 209). Plaintiff was diagnosed with fairly significant lateral compartment degenerative joint disease, and was recommended for surgery. (R. at 208, 287).

On November 21, 2007, Plaintiff underwent a right knee chondroplasty, with lateral meniscectomy, and debridement. (R. at 287). His post-operative diagnosis was degenerative joint disease and degenerative tear of the lateral meniscus. (R. at 287). A month following his surgery, Plaintiff was considered to be doing quite well. (R. at 206). Plaintiff engaged in physical therapy following his surgery through January 16, 2008. (R. at 225 – 26). He was capable of ambulating independently throughout. (R. at 225 – 26). While his flexion and knee strength improved, his physical therapist did not consider his range of motion or pain to be within normal limits, and recommended more therapy. (R. at 225 – 26).

In early January of 2008, Plaintiff appeared at the emergency department of UPMC complaining of right knee pain. (R. at 284). He claimed that while out at a social event, he noticed pain while walking. (R. at 284). The pain was alleged to be constant, sharp, and diffuse. (R. at 284). Upon examination, Plaintiff was found to be in no acute distress, his knee was not swollen, his surgical scar was well healed, there was no erythema[7], subcutaneous crepitus, instability, or significant pain, he had normal test results, and he had a normal range of motion.

---

[7] Erythema is a skin disorder caused by an allergic reaction or infection. Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000851.htm (last visited October 31, 2011).

(R. at 285). Plaintiff was given several doses of Vicodin for pain and was advised to see his doctor. (R. at 285). Plaintiff was observed to have ambulated to and from UPMC, using a cane, but without any difficulty. (R. at 285). Diagnositic imaging showed the existence of degenerative joint disease. (R. at 286).

Plaintiff followed up at Pittsburgh Bone & Joint Surgeons in late January. (R. at 205). Plaintiff's knee was considered to be symptomatic, with little improvement. (R. at 205). There was marked atrophy of Plaintiff's left quad, and tenderness was observed. (R. at 205). Plaintiff claimed that he had been very limited returning to his normal activity level. (R. at 205). He was given an injection of lidocaine for pain, and was considered a candidate for more aggressive treatment. (R. at 205). By late February, however, Plaintiff's knee was found by his orthopedic physician to be improving; although, there was some mild swelling, tenderness, and limitation in range of motion. (R. at 204).

On March 27, 2008, Plaintiff returned to the UPMC emergency department complaining of right knee pain. (R. at 280). Plaintiff's knee had allegedly been bothering him for several days, worsening that day when Plaintiff was out. (R. at 280). Plaintiff had taken no medication for pain. (R. at 280). Upon examination, Plaintiff was found to be in no acute distress, there was no swelling, erythema, or crepitus, Plaintiff's knees were stable, he had mild tenderness, and he had only slight limitation in his range of motion due to pain. (R. at 281). Diagnostic imaging showed the existence of degenerative joint disease, but no other abnormalities were found. (R. at 279, 281). Plaintiff was diagnosed with a right knee strain and discharged. (R. at 281).

Plaintiff appeared at the emergency department of UPMC in June of 2008, complaining of left shoulder pain. (R. at 265). Physical examination showed Plaintiff's neck to be non-tender, supple, and with a full range of motion. (R. at 265). There was tenderness of the left

6

shoulder joint. (R. at 266). All other extremities were well perfused and without evidence of clubbing, cyanosis[8], or edema[9]. (R. at 266). Plaintiff was diagnosed with left shoulder pain and was discharged. (R. at 266). Diagnostic imaging showed the left shoulder to be normal. (R. at 271).

Plaintiff was seen in the emergency department of UPMC in October of 2008 for complaints of pain in his feet. (R. at 276). He was observed experiencing minor difficulty ambulating. (R. at 276). Otherwise, Plaintiff appeared to be in no acute distress. (R. at 276). Diagnostic imaging showed no fractures, but did reveal the existence of degenerative joint disease. (R. at 277 – 78). There was some tenderness of the feet upon examination, but there was no swelling or erythema, and Plaintiff's range of motion was normal. (R. at 277). Plaintiff was diagnosed with osteoarthritis of the feet, and was advised to follow up with his doctor. (R. at 277). Later that same month, Plaintiff again appeared at UPMC complaining of right arm pain. (R. at 274). Plaintiff was determined to have cellulitis[10], but was otherwise in no acute distress. (R. at 274). Plaintiff's extremities were found to have a full range of motion, and good strength. (R. at 274).

Plaintiff returned to Pittsburgh Bone & Joint Surgeons on January 29, 2009, complaining that his right knee had given out and caused him to injure a toe on his left foot. (R. at 325). On March 25, 2009, following continued complaints about his right knee, Plaintiff underwent a lateral arthroscopic partial meniscectomy, chondroplasty abrasion, and Stedman-type microfractures. (R. at 328). During the surgery, the doctor noted significant lateral compartment

---

[8] Cyanosis indicates a lack of oxygen in the blood, and results in the skin turning a blue color. Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm (last visited October 31, 2011).

[9] Edema is swelling caused by fluid in body tissues, most often in the feet, ankles, and legs. Medline Plus, http://www.nlm.nih.gov/medlineplus/edema.html (last visited October 31, 2011).

[10] Cellulits is a bacterial infection located in the deeper layers of the skin. Medline Plus, http://www.nlm.nih.gov/medlineplus/cellulitis.html (last visited October 31, 2011).

7

arthritis, significant osteochondral lesions[11], maceration of the lateral meniscus, and extensive chondrosis[12] of the palletofemoral compartment with marked synovitis[13] and inflammation. (R. at 328). The surgery went well. (R. at 328).

C. Functional Capacity

Plaintiff failed to attend a functional capacity examination by the Bureau of Disability Determination that was scheduled for August 17, 2007. (R. at 198 – 203). No other functional capacity evaluations appeared in the record.

D. Administrative Hearing

The record indicated that Plaintiff spent several years as a security guard. (R. at 24). Plaintiff testified that he also worked several years as a landscaper. (R. at 23). Plaintiff's work history included gaps between 1991 – 2001, and 2001 – 2005, during which Plaintiff did not work. (R. at 24). Plaintiff claimed that he simply could not find work during those periods. (R. at 24). He subsisted on his parents' income, until his mother's death in 2008, and public assistance. (R. at 24 – 25). Plaintiff's father died in 2000. (R. at 25). As a result of declining health, Plaintiff took care of his mother until her death, indicating that – among other things – he carried his mother up and down steps. (R. at 25).

At the time of his hearing, Plaintiff claimed to be taking prescription Vicodin, and ibuprofen, for pain relief. (R. at 26). He described feeling pain all over his body, but that the worst pain was in his right knee. (R. at 26). Plaintiff testified that he had undergone two

---

[11] Osteochondral lesions are most common in the knee and ankle, and are tears or fractures in the cartilage covering one of the bones in a joint. Cedars-Sinai, http://www.cedars-sinai.edu/Patients/Health-Conditions/Osteochondral-Lesions-Osteochondritis-Dessicans.aspx (last visited October 31, 2011).

[12] Chondrosis is the development of cartilage. *Taber's Cyclopedic Medical Dictionary* 409 (Donald Venes, 20th ed. 2005).

[13] Synovitis is inflammation of a synovial membrane, resulting from an aseptic wound, rheumatologic disease, infection, subcutaneous injury, or irritation produced by damaged cartilage, overuse, or trauma. *Taber's Cyclopedic Medical Dictionary* 2130 (Donald Venes, 20th ed. 2005).

surgeries to repair his knee and alleviate his pain, the second of which had been completed just a few weeks before the hearing. (R. at 26). The first surgery did not provide relief. (R. at 29). Plaintiff's left knee, left shoulder, and feet also gave him difficulty. (R. at 27 – 29). Allegedly, as a result of pain, instability, and swelling in his knees, Plaintiff required the use of crutches to ambulate, and he had used a cane in the past. (R. at 28 – 29, 32 – 33).

Prior to his first surgery, a typical day for Plaintiff included caring for his mother and doing housework. (R. at 30 – 31). Following his first surgery, Plaintiff spent most of his day sitting. (R. at 30). Plaintiff claimed that he could stand for about thirty to forty five minutes, and walk three to four blocks, or for about thirty minutes. (R. at 31 – 32). Due to allegedly frequent buckling following his first surgery, Plaintiff could not stand or walk for long periods. (R. at 31). In terms of sitting, Plaintiff's left hip allegedly prevented him from sitting for long periods. (R. at 33). Plaintiff's bodily pain required him to spend periods of the day lying down. (R. at 34). In light of this physical pain and limitation, Plaintiff believed that he could not hold a full-time job, even if it was relegated to sitting, only. (R. at 34).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether jobs existed in significant numbers in the national economy for a person of Plaintiff's age, educational level, and work experience, but limited to sedentary, sit-stand work with no concentrated exposure to dust, odors, or gases. (R. at 36). The vocational expert replied that such a person would be capable of working as a "surveillance system monitor," with 115,000 positions available in the national economy, as a "machine feeder and off-bearer," with 72,000 positions available, and in "bench assembly," with 160,000 positions available. (R. at 35 – 36). The ALJ followed up by asking whether the hypothetical person could still work if further limited by the need to lie down

9

randomly, three to four times per day. (R. at 36). The vocational expert responded that no jobs would be available to such a person. (R. at 37).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[14] and 1383(c)(3)[15]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of

---

[14] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[15] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4). *See*

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

V. **DISCUSSION**

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of degenerative arthritis, quad atrophy of the right knee status post surgery, status post crush injury to the left foot, lumbar radiculopathy, generalized osteoarthritis of the left hip, hypertension, and asthma. (R. at 12). Plaintiff was determined not to be disabled because he had the functional capacity to perform sedentary work, except that he would need to avoid concentrated exposure to environmental irritants such as dust, odors, and fumes, and he would need to be able to alternate between sitting and standing. (R. at 12 – 13). Consistent with the testimony of the vocational expert, Plaintiff qualified for a significant number of jobs in existence in the national economy. (R. at 16 – 17).

Plaintiff attacks the decision of the ALJ because he failed to find Plaintiff disabled at Step 3. (ECF No. 8 at 4). The listing at issue – 1.02 – will automatically qualify a claimant for disability benefits if major dysfunction of a joint may be:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 1.02. Plaintiff argues that objective medical evidence on record documented gross anatomical deformity with chronic pain and stiffness in Plaintiff's right knee, and that the condition of his right knee prevented him from ambulating effectively. (ECF No. 8 at 4 – 7). In light of the ALJ's discussion and the evidence on record, however, Plaintiff's argument is unpersuasive.

In terms of anatomical deformity, there were no significant findings of instability in Plaintiff's right knee; in fact, Plaintiff's knee was noted numerous times to be stable, despite his degenerative joint disease and compartment narrowing. (R. at 13 – 16, 210, 274, 281, 285). No significant evidence of right knee instability appeared on the record until January of 2009; even then, there was no definitive medical finding of instability. (R. at 13 – 16, 325). While Plaintiff frequently complained of pain, he was typically noted to be in no acute distress. (R. at 13 – 16, 281, 285, 295 – 96). In terms of limitation of motion, while his physical therapist indicated that his range of motion in the right knee was not within normal limits, contemporaneous findings at UPMC – and throughout the record, generally – indicated that Plaintiff's range of motion was typically normal or only slightly limited. (R. at 13 – 16, 204, 274, 281, 285, 296). UPMC medical records also regularly indicated a lack of significant abnormality, aside from degenerative joint disease and compartment narrowing. (R. at 13 – 16, 210, 281, 285, 296). Based upon the ALJ's explanation and the record, it appears that Plaintiff did not meet the requirements under the first part of Listing 1.02.

With respect to the second part of 1.02, Plaintiff also fell short of establishing that he could not "ambulate effectively." 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b provides a definition:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

In his own report of daily activities, Plaintiff indicated that he traveled on his own, bought groceries, went out to socialize, and attended sporting events. (R. at 13 – 16, 122 – 31). Following his first surgery in November of 2007, Plaintiff was observed to ambulate independently to and from the hospital, with a cane, and without any difficulty. (R. at 13 – 16, 225 – 26, 285). In October of 2008, UPMC staff noted that Plaintiff exhibited only minor difficulty ambulating. (R. at 13 – 16, 276). Until May of 2008 – the time of his mother's death – Plaintiff was providing his mother with care, and testified that he carried her up the stairs. (R. at 13 – 16, 25). As noted by the ALJ, this evidentiary record does not support a degree of physical limitation as severe as claimed by Plaintiff. It certainly does not support a finding of inability to ambulate effectively as contemplated in the regulations. *See Morrison v. Comm'r of Soc. Sec.*, 268 Fed. App'x 186, 188 (3d Cir. 2008) (finding that despite the existence of evidence on the record illustrating some difficulty with ambulation, the record as a whole indicated that the

claimant was not generally limited enough to be considered unable to ambulate effectively for purposes of Listing 1.02).

Plaintiff claimed to have been disabled beginning January 4, 2005. Substantial evidence clearly supported the ALJ's decision indicating otherwise. There is no mention of knee pain in the record until Plaintiff appeared at UPMC in August of 2007. (R. at 13 – 16). At that time, there were minimally abnormal findings. Plaintiff's primary care physician never found Plaintiff to be more than temporarily disabled. (R. at 13 – 16). Subsequent to his first knee surgery in November of 2007, the record did not indicate pain and limitation as severe as averred by Plaintiff. (R. at 13 – 16). Between March of 2008 and January of 2009, there were no documented medical treatments for Plaintiff's knee pain. (R. at 13 – 16). The ALJ's failure to find that Plaintiff met Listing 1.02 was not in error, given the inconsistency between Plaintiff's complaints and the facts on the record.

## VI. CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not supported. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: November 4, 2011
cc/ecf: All counsel of record.